# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## ALLEN T. CAPERTON *vs.* NICHOLAS MARTIN.

### January Term, 1870.

1. The plea of "belligerent rights," *i. e.* the plea to exculpate parties from trespasses committed upon loyal people during the late rebellion, by reason of being in the service of the so-called confederate government, again declared to be unavailing.

2. The act of the Legislature of this State, passed, February 27, 1866* declaring that the period from April 17, 1861, to the passage of the act, should not be computed in counting the time under any statute of limitations in certain counties, is not unstitutional.

3. A distinction is taken in favor of an act of the Legislature which revives a remedy, which is lost by reason of a statute of limitation, and the case of a remedy cut off or destroyed by the same authority. The former does not violate the obligation of a contract; the latter does. The former is a privilege which may be conferred by the same power by which it was divested; the latter affects the vested rights of a party.

4. If a plea is bad and the replication also bad, a demurrer to the latter should be sustained and the plea held for naught. But as an issue thus raised in the court below is an immaterial one, the error in overruling the demurrer to the replication could not be to the prejudice of the party filing the plea, and he cannot be heard in this court to complain of it.

5. It is proved in an action of trespass for false arrest and imprisonment, that the plaintiff was imprisoned by the defendant, the latter acting as provost marshal for the so-called confederate authorities, in the jail of M. county; that he was afterwards surrendered by the jailor to the provost guard and taken to Richmond, where he was held on a charge of disloyalty to the so-called confederate government, and subsequently removed to Salisbury prison, North Carolina; that by general orders it was the

---

*Be it enacted by the Legislature of West Virginia: In computing the time within which any civil suit or proceeding in tresspass or case shall be debarred by any statute of limitation in the countins of Pendleton, Hardy, Grant, Monroe, Wayne, Putnam, Calhoun, Gilmer, Kanawha, Doddridge, Harrison, Upshur, Marion, Taylor, Lewis, Hampshire, Mineral, Greenbrier, Boone, Logan, Wyoming, McDowell, Mercer, Raleigh, Pocahontas, Webster, Clay, Nicholas, Fayette, Cabell, Morgan, Jefferson, Berkeley and Roane, the period from the first day of March, eighteen hundred and sixty-five, to the date of the passage of this act, shall be excluded from such computation.

duty of defendant to turn over persons charged with like offenses with the plaintiff to the nearest confederate military authorities, which were at the time of the arrest at a certain place in M. county, and that the defendant had no authority to make any other disposition of persons charged with like offenses with the plaintiff. The defendant moved to exclude that part of the testimony which related to the imprisonment at Richmond and Salisbury. HELD:

> That it was not error in the court below to refuse the motion to exclude, as the evidence was pertinent and proper.

6. A party is sued for false arrest and imprisonment committed by him during the war, and whilst he was in the service of the so-called confederate states, and on the trial offered to put in evidence a pardon granted him by the President of the United States, granting amnesty for all offenses by him committed, arising from participation in the rebellion, and it is held that it was not proper or competent evidence.

This was an action of trespass on the case for illegal arrest and false imprisonment, brought by Nicholas Martin against Allen T. Caperton, in the circuit court of Monroe county, to June rules, 1866. The declaration alleged that the defendant, who was acting as provost marshal under so-called confederate authority, with force and arms seized the plaintiff, on the 28th day of October, 1862, in the county of Monroe, and transported him to Richmond, Virginia, where he procured and directed him to be confined in a dungeon, &c., to his great damage, &c.

At the October rules, 1866, the defendant demurred to the declaration, pleaded the general issue, and filed six special pleas. The first and second pleas were the statute of limitations, viz: that the suit had not been brought within one and two years respectively, from the time the right to bring the same accrued. The third plea averred that more than one year had elapsed after the right to bring the action accrued, and before the 1st of March, 1865, when an act* in relation to the statute of limitations was passed. The fourth plea averred that, at the time of the supposed trespass,

---

Be it enacted by the Legislature of West Virginia: In computing the time within which any civil suit, proceeding or appeal shall be debarred by any statute of limitations, the period from the seventeenth of April, eighteen hundred and sixty-one to the date of the passage of this act, shall be excluded from such computation.

both plaintiff and defendant were residents of the State of Virginia, and that by the law of that State the whole time prescribed for the action had expired before the act of the 1st of March, 1865, passed by the Legislature of West Virginia. The fifth plea was the plea usually known as "belligerent rights plea." The sixth plea was a pardon granted to the defendant by Andrew Johnson, President of the United States, for offenses arising by reason of participation in the rebellion.

The circuit court overruled demurrers of the defendant to the declaration, and also to plaintiff's replication to the pleas of the statute of limitations, and sustained the demurrers of the plaintiff to the fourth, fifth and sixth pleas of the defendant.

The cause was tried at the November term, 1867, and a verdict rendered for the plaintiff for 600 dollars damages, upon which judgment was rendered.

The defendant brought the case here on a writ of supersedeas.

Hon. N. Harrison, judge of the circuit court of Monroe county, presided on the trial of the cause.

*Boggess* and *Lee* for the plaintiff in error.
*Stanton & Allison* for the defendant in error.

BROWN, *President.*

When it was sought to apply to the rebellion the laws of war, and confiscate their property taken on the high seas, as "enemy's property," it was objected, and protection claimed under the constitution and laws of the land.

Now, when it is sought to apply to them the municipal laws, it is objected, and immunity claimed on the ground that they are only liable to the laws of war.

But Marshall, C. J., delivering the opinion of the supreme court of the U. S., in the case of *Rose* vs. *Himely*, 4 Cranch, 272, said: "It is not intended to say that belligerent rights may not be superadded to those of sovereignty."

And Greer, J., delivering the opinion of the court in the *Prize cases*, 2 Black., 693, says; "Now, it is a proposition never to be doubted, that the belligerent party who claims to be sovereign may exercise both belligerent and sovereign rights." The very point decided in *Rose* vs. *Himely* was, that France, while waging war upon her colony, and subjects of St. Domingo, to reduce them to submission to her authority, which they had thrown off, not only might exercise her sovereign rights, as well as her belligerent rights upon her rebellious subjects, and their property, but that she did in that case, in fact, exercise her sovereign rights.

In the *Prize cases* the very point decided was not only that the government of the U. S. might exercise its belligerent rights as well as its sovereign rights upon the persons and property of its citizens in rebellion, but that in that case it did exercise its belligerent rights.

It has been often urged that rebels could not be enemies; but it is reserved for the inventive genius of the late rebellion after its demise, to discover that enemies cannot be rebels, and amenable in both characters.

It was a conceded point, in both the cases just referred to, that the government might exercise sovereign rights, but the cases also show, not only that either may be exercised, but that both may be. And in the latter case, Justice Grier said with emphasis: "The appellants contend that the term enemy is properly applicable to those only who are subjects or citizens of a foreign state at war with our own. They quote from the pages of the common law which say 'that persons who wage war against the King may be of two kinds, subjects or citizens.' . (It would seem that the word aliens had been inadvertently omitted after citizens, in the preceding sentence.)

"The former are not properly enemies, but rebels and traitors; the latter are those that come properly under the name of enemies." * * * * *

"This argument rests on the assumption of two proposi-

tions, each of which is without foundation on the established law of nations. It assumes that where a civil war exists, the party belligerent, claiming to be sovereign, cannot for some unknown reason, exercise the rights of belligerents, although the revolutionary party may. Being sovereign, he can exercise only sovereign rights over the other party. The insurgent may be killed on the battlefield, or by the executioner; his property on land may be confiscated under the municipal law; but the commerce on the ocean, which supplies the rebels with means to support the war cannot be made the subject of capture under the laws of war, because it is *unconstitutional !*

"Now it is a proposition never doubted, that the belligerent party who claims to be sovereign, may exercise both belligerent and sovereign rights."

It is to the exercise of this sovereign right, as contra distinguished from the exercise of a belligerent right, that Vattel refers, in laying down the rule which should govern the conduct of the sovereign on suppressing a rebellion, and his treatment of the rebels, and especially the ringleaders. He says: "A sovereign, having conquered the opposite party and reduced it to submit and sue for peace, he may except from the amnesty the authors of the trouble, and the heads of the party, may bring them to a legal trial, and on conviction, punish them." Vattel, book 3, chap. 18, sec. 294.

And again : "It will be wise in the Prince to secure his prisoners till, having restored tranquility, he is in a condition of having them tried according to the laws." And again : "Subjects, who take arms against their sovereign, without ceasing to acknowledge him, cannot pretend to the effects which the law of nations attributes to public war." See chap. 12 of this book.

Nor can there be any possible difference in principle, in the case of "subjects who take arms against their sovereigns without ceasing to acknowledge him," and subjects who repudiate their allegiance to him but fail in their attempt

at revolution. Abortive revolution or rebellion is always a crime in the eye of the law, to be pardoned or punished at the discretion of the sovereign whose government was sought to be subverted. The moral guilt, the glory, or disgrace attendant, is generally determined at the bar of public sentiment, and afterwards affirmed or reversed in the light of impartial history. In the progress of war, to treat the rebel as an enemy, instead of as a traitor, is the right of the sovereign, and is a grace to the rebel which the latter has no right to demand, if withheld, nor just ground for complaint if accorded for the sake of humanity; and the reason is given by the same learned judge in delivering the opinion of the court in the *Prize cases*, because, "Using only the milder modes of coercion which the law of nations has introduced, to mitigate the rigors of war, cannot be a subject of complaint by the party to whom it is accorded as a grace or granted as a necessity."

In a war of rebellion, Mr. Halleck says : " Belligerent rights may be superadded to those of sovereignty, that is, the contending parties may exercise belligerent rights with regard to each other, and to neutral powers, while, at the same time, the established government of the state may exercise its right of sovereignty in punishing, by its municipal laws, individuals of the insurgent or revolting party, as rebels and traitors." Halleck's International Law, 344. And he cites, as authorities, Grotius de Jur. Bel., ac. Pac. lib. 1, chap. 3, sec. 1; Vattel, Droit des Gens., lib. 2, chap. 4, sec. 56; Wheaton's Elm. Int. Law, pt. 1, ch. 2, sec 7; Pt. 4, ch. 1, sec. 7; De Felice Droit de la Nat., etc., tome 2, lec. 22; Bello Derecho International, pt. 2, cap. 10, sec. 1; Burlamiqui Droit de la Nat. et des Gens., tome 5, pt. 4, ch. 3; *Rose* vs. *Himely*, 4 Cranch., 272.

And again he says, p. 371, sec. 24: "We have thus far mostly confined our remarks to the effects of a declaration of war upon belligerent states and their subjects in their international relations. Its effects upon the relations of the citizens of a belligerent state with their government, belong

to constitutional and municipal law, rather than to general public law."

In a case involving the identical questions raised here, the supreme court of Tennessee said : "We cannot assent to the proposition, that a peaceful citizen, engaged in no act of hostility to either party, but in the discharge of his ordinary and legitimate business, is subject to arrest, imprisonment and seizure of his property, at the will of men who have organized an insurrectionary force to overthrow and destroy their lawful government. It is according to those in arms, rights, and privileges that do not belong to the officers of the lawful government."

And again : "The acts of the plaintiffs, in error, in seizing the property of Stout, was unlawful; the orders of their superior officers is no defence; they were all trespassers who were present, assisting, aiding or abetting, and must be held liable for the consequences of their illegal acts." *Yost* vs. *Stout*, 4 Caldwell, 205 ; also, *Davidson* vs. *Manlove ; Wright and Cantrell* vs. *Overall*, 2 Caldwell, 337; *Wood* vs. *Stone*, Id., 369. I take it, then, to be a question settled on principle and authority, that the lawful government might lawfully exercise its sovereign rights over all the broad limits of the land as well within as well as without the insurrectionary district.

And what I mean by the exercise of a sovereign right, in this case is, the continuance unrepealed of the municipal laws, and the liability of the citizen to them; in other words,. the continuance in full force of the only lawful rule of action prescribed by the supreme power of the state, addressed to all who were bound to obey, and whose obligation of obedience was not, and could not, be discharged by a denial of the obligation, nor by an abortive attempt to defeat it.

I have reconsidered with care the principles decided in the case of *Hedges* vs. *Price*, 2 W. Va. Rep., 192, and *Williams* and *Freeland*, Id., 306, and which have been reargued. by permission of this court in the present case, with zeal, learning, and ability, and I have been unable to arrive at.

any satisfactory conclusion of the law that would warrant a departure from the principle of those cases. I must hold, therefore, in all these cases, the defence, in whatever form presented under the head of belligerent rights, a failure, and rebels, no less than loyal citizens, amenable to the laws for their conduct, and responsible to whom they have injured.

The preceding part of this opinion was prepared before the last July term, and the result then announced, but the judgment was not then entered because of the absence of the plaintiff in error, that he might have an opportunity to apply to the supreme court of the United States for a writ of error, as it was understood he desired to do. Since then I have been furnished with a newspaper report of the opinion of the supreme court in the case of *Thorington* vs. *Smith and Hartley*, recently decided. I have considered it carefully and find in it nothing to change the views and conclusions above indicated.

The point there decided does not arise in the case now under consideration in this court; and though the rehearing may embrace propositions broad enough to impinge upon them, yet it seems to me, with all due deference to that high tribunal, that the reasoning is more specious than sound, and some of the propositions stated irreconcilable with each other. For instance, it is said that "From a very early period of the civil war to its close, it, the confederate government, so-called, was regarded as simply the military representative of the insurrection against the authority of the United States." And in the next sentence it is stated to be "A *de facto* government of paramount force," * * * "and while it exists, it must necessarily be obeyed in civil matters by private citizens, and may be administered also by civil authority, supported more or less by military force." Now, how are we to reconcile the idea of a "simply military representative of the insurrection," with the idea of "a *de facto* government of paramount force, administered also by civil authority?"

Again it is said that "The supremacy of the insurgent

góvernment cannot be questioned," and in the next sentence, "That its supremacy would not justify acts of hostility to the United States."

Again, it is said: "How far its supremacy should excuse acts of hostility to the United States must be left to the lawful government upon the re-establishment of its authority. But it made civil obedience to its authority not only a necessity but a duty." Now, it is not perceived how the supremacy of the insurgent government could make civil obedience to its authority a duty, and yet not justify a military obedience to its authority, the supremacy of which, according to the statement, "could not be questioned." And the reason assigned for the duty of obedience in civil matters is no less inconsistent as coming from a co-ordinate department of the government sought to be overthrown, viz: "That without such obedience, civil order was impossible," i. e. among the insurgents.

The lawful government was seeking to obtain that desirable end, by enforcing a return and submission to its authority. Civil order was the end, and obedience to the lawful government, instead of the insurgent government, was a means, commanded in executive proclamations, and enforced by sovereign and belligerent power.

The fallacy in the case seems to be in ignoring the fundamental distinction between the case of the confederate government, so-called, and the *Cartien and Tampeco* cases. In the latter cases the people without fault submitted against their will, to governments imposed upon them by paramount force; but, in the former case, it was not so. There was no government imposed by force on the rebels. They, the people of the insurrectionary states, as stated, subverted the lawful government, and established an unlawful one in its stead in a part of the States of the Union, and then with willing hearts and ready hands upheld, defended and obeyed its authority. The only force was self-imposed, and cannot, therefore, be pleaded in justification of civil any more than military obedience to a creature of their own creation, as against

the lawful government. It would be to take advantage of their own wrong. The still more recent decision of the supreme court of Alabama, also reported in the papers, seems to be much more consonant with principle and sound reason, in which, it was said to be held, that the insurgent governments from 1861 to 1865 were illegal, and the officers thereof usurpers, and their acts void. But uninfluenced by these newspaper reports, I prefer to rest the case upon the views before indicated.

To the defence of the statute of limitations, three answers may be given.

1st. On the defendant's pretension that the county of Monroe, where the trespass complained of was committed, was a part of the confederate states, and of the states confederating, from April 17th, 1861, to April 2d, 1866, and under the actual dominion thereof, and of those exercising authority under and by virtue thereof, and in aid of the same. Just suppose the plaintiff, at any time between the 29th of June, 1862, the date of the trespass alleged, and the 27th of June, 1863, the date it is claimed to have been barred, or at any later date before the 2d of April, 1866, had had the folly and presumption to have brought his suit in the courts of Monroe county, to recover of the defendant damages for his imprisonment, what would have been the result? Can it be supposed that his suit would have shared any better fate than himself? And was not his past personal experience enough to admonish him that an attempt to prevent the bar of the statute of limitations from running against his claim for damages, by instituting his suit there, would cost him more than the imaginary recovery would amount to? No rational man would have attempted the rashness and folly of bringing such a suit at such a time, in such a court, for such a cause, and under such circumstances. And on what principle of justice or policy, (for statutes of limitations are statutes purely of policy,) unless the policy be to encourage rebellion, by refusing redress to the loyal citizen, and shielding the rebel from the liability he has

·incurred, can the injured party be held to have forfeited his rights by failure to sue for them, on the defendant's pretention as above supposed ? I think the statement of the case suggests the answer.

But a second answer may be given to the defence of the statute of limitations. By the proclamation of the President of the United States, of August 16th, 1861, issued in pursuance of the act of Congress approved July 13th, 1861, it was declared that the inhabitants of the State of Virginia, &c., (except the inhabitants of that part of the State, of Virginia lying west of the Allegheny mountains, and such parts of that State and the other States thereinbefore named as might maintain a loyal adhesion to the Union and Constitution,) were in a state of insurrection against the United States. This court judicially knows that the county of Monroe lies west of the Allegheny mountains, and was not, therefore, embraced in the said proclamation, and so not declared to be in a state of insurrection.

By the President's proclamation of July 1st, 1862, issued in pursuance of an act of Congress approved June 7th, 1862, it was declared, that the States of South Carolina, &c., naming them, and Virginia, except the following counties : Hancock, Brooke, Ohio, Marshall, Wetzel, Marion, Monongalia, Preston, Taylor, Pleasants, Tyler, Ritchie, Doddridge, Harrison, Wood, Jackson, Wirt, Roane, Calhoun, Gilmer, Barbour, Tucker, Lewis, Braxton, Boone, Logan, Wyoming, Webster, Fayette, and Raleigh, were then in insurrection and rebellion. As Monroe is not excepted, it was declared to be in insurrection and rebellion. The use of the word States in this proclamation, instead of inhabitants of States, as in the preceding proclamations, was manifestly for brevity, and not to change the sense, manifestly the same in all, otherwise it would be inconsistent with the theory on which the rebellion was suppressed, and the Union maintained, and absurd in itself. The change of States from peace to war is a question to be determined and declared by the political department of the

government; and being so done and proclaimed, the courts must see only the status of peace existing in Monroe county till July 1st, 1862, and after that the status of insurrection and rebellion, until April 2d, 1866, when the President, by proclamation of that date, declared the insurrection, which before that time existed in Georgia, South Carolina, Virginia, North Carolina, Tennessee, Alabama, Louisiana, Arkansas, Mississippi, and Florida, was then at an end, and was thenceforth to be so regarded, unless civil jurisdiction was actually resumed, and loyal courts actually organized there at an earlier date.

Since then the arrest and imprisonment is the trespass complained of, and which occurred on the 29th of June, 1862, and continued thereafter until July 22d, 1862. There was no time till after April 2d, 1866, or till the courts of this State were organized and actually held there, when the party injured could have had redress in the courts of Monroe county; not in the rebel courts of the county, because this court cannot judicially know that there were any such courts there, and if there were, the plaintiff could not have had redress in them, because his rights were wrongs in their eyes, and the defendant's trespasses not only justifiable, but official duties, patriotically performed, and therefore to be commended, and himself protected, rather than mulcted in damages in such court, the plaintiff could have had no redress in a loyal court, for, in point of law, none could exist there, while the status of the county was that of insurrection and rebellion, which, we have seen by the proclamation cited, existed from July 1st, 1862, to April, 2, 1866, unless that status had been changed by the actual exercise of jurisdiction by courts restored.

But the evidence in the cause also shows that not only did the condition of insurrection and rebellion exist for the time in Monroe county as a legal status, but also as a stern reality, and matter of fact.

The action was brought in May 11th, 1866. It was not barred, therefore, because no period of limitation, either of

one or more years, within which he was allowed by law to sue, or within which he could have brought his suit, had expired before the suit was brought. For, in addition to the obstacles above suggested to his suing sooner than April 2d, 1866, as matters of law, this court must take judicial notice of the fact that there never were any loyal courts organized in Monroe county from June 11th, 1861, till after the cessation of actual hostilities, either under the restored government of Virginia or of West Virginia, and consequently no possibility of redress by a suit in court during that period, to the plaintiff, for the injuries complained of.

A third answer to the defence of the statute of limitations, is the act of West Va., February 27th, 1866, declaring that the period from April 17th, 1861, to the date of the act, shall not be counted in computing the time under any statute of limitations.

This act, however, is assailed as repugnant to the Constitution, both of the State and of the United States, as retrospective and divesting vested rights; that is, it is claimed that after one year from the trespass, the defendant could not be sued for it, and he acquired a vested right to be never after sued for it. It is true the act is retrospective, for it says so, and there is nothing prohibiting the legislature from passing it on that ground, in either the State or Federal Constitution. *Calder* vs. *Ball*, 3 Dall., 386; *Wyatt* vs. *Morris*, 2 W. Va. Rep.

But is it true that it divests any vested right of the defendant? The right so claimed to be vested is immunity from a just liability, by virtue of the statute of limitations, the effect and operation of which were suspended in the county of Monroe, where the parties resided and the liability accrued, during the whole period of limitation, and more. It was so suspended, too, by reason of the insurrection and rebellion there existing, in which the defendant was a participant, and in aid of which he committed the trespass complained of. What right or immunity could possibly be

acquired under a suspended law, and that suspension the result of an unlawful combination of persons in resistance to the execution and enforcement of the laws by the lawfully constituted authority that enacted them originally? Surely no legal right could be acquired in such case, nor by such means. The lawful government could not recognize such claim to immunity, and if it did, it is perfectly competent to it to divest it, while the relation of enemy exists, as the defendant claims the act of February 27th, 1866, to have done in this case.

In the case of *Jackson* vs. *Lamphire*, 3 Pet., 290, Mr. Justice Baldwin, delivering the opinion of the court, said: "It is within the undoubted power of State legislatures to pass recording acts, by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time, &c." * * * "Such, too, is the power to pass acts of limitations, and their effects. Reasons of sound policy have led to the adoption of laws of both descriptions, and their validity cannot be questioned. The time and manner of the operation, the exceptions to them, and the acts from which the time limited shall begin to run, will generally depend on the sound discretion of the Legislature, according to the nature of the titles, the situation of the country, and the emergency which leads to their enactment."

Here there was a state of civil war, and all through the State disloyalty and hostility intermixed, and in many counties varying and intensifying until it terminated in insurrection and rebellion, absolute and exclusive.

The period, however, of collapse to the rebellion was manifestly at hand, when the act in question was passed. The situation of the country and the emergency which led to the enactment, were present and real; they called imperiously for wisdom and policy in providing for the extraordinary crisis by legislation to suit the occasion. And in the language of the learned judge, "the time and manner of the operation, the exceptions to them, and the acts from

which the time limited shall begin to run, will generally depend on the sound discretion of the legislature, according to the nature of the titles, the situation of the country, emergencies, &c."

Not only the date of the act, but its application to certain counties only, which were most afflicted, and longest, by the calamities of insurrection, clearly show the emergency which led to the enactment, and that it was the policy of the legislature to provide for the wants and meet the situation of those sections of the country. Nor is it for the courts to say the policy was not wise and necessary. Nor should it be overlooked that there is a marked distinction between the case of a remedy prolonged, or even revived, and the case of a remedy cut off or destroyed.

The latter impairs the obligation of the contract, and would be repugnant to the Constitution on that account, and therefore void; but not so the former.

To extend to one who has a right, but has lost the remedy the statute gave, or permitted to him, a new remedy, does no wrong nor injustice to any one, necessarily, nor does it impair the obligation of any contract, nor invade a vested right.

A debt barred by the statute of limitations is not vested of right in the debtor, nor is the right of the creditor to it thereby divested, though the remedy is barred. Such is the universal sense of mankind, and such is the law, and, therefore, it is a good consideration for a new promise. So, also, a debt discharged by bankruptcy. The objection that the power to pass retrospective laws is a dangerous power, and liable to abuse, is no argument against the existence of the power, subject to the constitutional restrictions, against *ex post facto* laws, and such as impair the obligation of contracts; and it is equally true that it is a power eminently conservative and so essential, that but few of the States have ever yet prohibited, in their constitutions, the exercise of it by the legislature, when it might be thought necessary and proper for the public weal.

I have not thought necessary to cite and review the numerous and conflicting authorities on the subject, but content myself with resting my conclusion on the views above indicated, and the peculiar and extraordinary conditions of the country, the emergencies requiring redress, and the legislative powers of a State, and the limitations thereon in the Federal and State constitutions. And my conclusion in the premises is that the act is not unconstitutional.

Concurring, therefore, in the determination of the other points decided in the cause, I must concur also in affirming the judgment.

BERKSHIRE, J. Of the numerous errors assigned, I propose to consider, first, the question raised by the fifth special plea. It is what is designated the plea of belligerent rights, and was the ground upon which the defendant mainly rested his defense.

It is clear that if the trespass had been committed in ordinary times of peace, no question of the defendant's liability could have been raised. But the plea, confessing the trespass and imprisonment charged in the declaration seeks, nevertheless, to justify them by reason of alleged authority derived from the so-called confederate government. And the question is whether the matters averred in it, which are admitted on demurrer to be true, constitute a justification of the grievances complained of.

This question has been before this court in several cases, in which the defense set up in this plea was overruled. *Hedges* vs. *Price et. al.*, 2 W. Va. Rep., 192; *Freeland* vs. *Williams*, 2 W. Va. Rep., 306.

But owing to its great importance a re-argument of the question has been allowed before a full court at the instance of the parties intersted in maintaining this defense. I have, therefore, considered this case with more than ordinary care and solicitude. And after diligent and patient examination of the authorities, enlightened and aided by the very able and exhaustive arguments of counsel, I have been

led to satisfactory and stable conclusions, and will proceed, as concisely as may be, to state the grounds and assign some of the reasons upon which I am enabled to rest my judgment.

On behalf of the plaintiff in error, it was earnestly and ably maintained that this court must be governed, in the present instance, exclusively by the international law, which, it is insisted, would fully sustain the defense set up in the plea under consideration.

That all courts, from the supreme to the most inferior, are bound by the international law whenever its rules and principles apply to the case to be adjudicated, is a proposition that need not, and, I think cannot, with success, be controverted.

The vital controversy here, however, is as to the application of the doctrine. And the fundamental defect in the argument in support of the defense made, as it seems to me, consists in the failure to observe the proper and settled distinctions which exist between international and internal wars, and in seeking to apply to cases arising under the latter principles, which are only applicable to the former.

Now, a very little consideration, it seems to me, will suffice to make these distinctions strikingly apparent, and disclose the cardinal error on which was erected the whole argument in support of the doctrine and defense insisted on. I will endeavor, therefore, briefly to point out some of the obvious distinctions, which, it appears to me, have been wholly overlooked and confounded in the argument, whereby, I think, erronious conclusions have been reached by counsel who have maintained, with so much zeal and ability, the validity of the defense set up in the plea we are now considering.

And first as to public or international wars. With respect to such it must be observed that neither nation has any advantage over the other on account of sovereignty. But each party to the war being sovereign and independent, they necessarily stand on equal ground in this respect, and

it follows as a consequence that each must be governed in the conduct of the war, exclusively by the international law and the *jus belli*. And in this respect also, they are equals, and are each entitled, to the same extent, to the fullest exercise of belligerent rights and to the equal protection of the international law and the rights of war. And this, too, without regard to the supposed culpability of the parties to the war in the estimation of other nations. For it is well settled that an independent power waging a war that may, in the judgment of all others, be considered unjust and oppressive on the part of such power, is nevertheless equally entitled to the exercise and protection of belligerant rights as the adverse power who may stand before all the world justified.

From these principles it follows, as a matter of course, that everything done in conducting such wars, in accordance with the principles of the public or international code and the *jus belli*, whether by the governments or the soldiers and citizens engaged in the war, is in the strictest sense legal and justifiable, and neither can be held responsible to any person or power for any such acts. But in such cases the citizens of each nation, and the governments as well, must be indemnified (if at all) for any loss or injury resulting to them from the operations of the enemy during the war, by the treaties of peace in which such wars usually terminate. And, thereafter, the parties to such treaties must be governed by the stipulations therein contained. But if the war should result in the entire subjugation and extinction of one of the belligerent powers, which sometimes happens, then, of course the vanquished party must submit to and be governed in the future, by such laws and conditions as may be imposed by the conqueror.

The international law, it may be well to observe, is not the law of individuals, nor between individuals, and to govern individuals; nor is it the law between nations and individuals, but as its terms imply, it is the law of and between nations and to govern nations only.

Hence it is that in national wars there can be no such thing as individual or personal responsibility for acts done in the prosecution of the war in accordance with the public law, but such responsibility of the citizen engaged in such wars is assumed by and merged in his government. And this results from the fact that the quarrel in such cases, which has resulted in the war, is with the government and sovereign power of the nations, and not with the individual citizens and subjects of such nations.

Another principle recognized by the international code is, the undisputed right of independent nations to resort to war in the event of failure to settle by negotiation the national controversy, and thus to prosecute by force of arms their demands against each other. Such wars, therefore, are always regarded in every respect as legitimate and legal, however much they may be condemned by other nations as unnecessary and even unjustifiable; there can, therefore, be no such a thing as illegal wars between independent powers. But the right to enforce their supposed demands or grievances against each other by the wager of battle, is as clear as the right of the citizen is to enforce by suit his demands against individuals. And the war on either side being legal, it follows, as a consequence, that each party may avail himself, to the fullest extent, of the belligerent rights, conceded in such wars, even as an ancilary to the primary object of defeating and subduing the enemy.

All of the principles enunciated above, I think, will be found fully sustained and affirmed by the authors and writers on international Law, as well as by numerous adjudications. Wheaton's Int. Law; Halleck's Law of Nations, 306, 348, 463; Wheaton's Int. law, part 4, ch. 1, p. 505; Id., ch. 2, p. 597; Vattel, book 3, p. 357; Id., p. 446-7.

Second: As to civil wars and rebellion:

In considering these in contrast with national war, the first thing that necessarily arrests our attention, is the striking difference in the relations which the citizen en-

gaged in the rebellion sustains to the rightful government and the loyal subjects of such government, and the relations which subsists between the citizens of an independent power engaged in a war with another independent nation, and the government and citizens of the opposing powers.

In the latter case, as we have seen, the war itself on either side being legal, all acts and proceedings done in accordance with the law of nations are likewise legitimate, and no personal responsibility for such acts and proceedings attaches to the individuals who participated in them.

But in the former case, while the war on the part of the government is in the highest sense legal and justifiable, and in our case, I must add, eminently patriotic, the war on the part of the insurgents'is as clearly illegal; and not only so, but often, (as in the case we are considering,) wholly indefensible and highly criminal.

In the arguments here the illegality (in the strictest sense) of the operations of the rebels engaged in the late rebellion was conceded. But it was strenuously insisted that they were justified or excused for the illegal acts done and trespasses committed by them in the prosecution of the rebellion, by reason of the belligerent rights to which, as a belligerent power, they were entitled, by the international code, and which, it was claimed, were acknowledged and accorded to the rebels, by the government, pending the conflict.

This position, it seems to me, has no foundation, either in law, reason or justice, and is utterly untenable.

Now it may well be conceded, that under the law of nations, the parties engaged in a civil war, while so engaged, are entitled to the exercise and protection of belligerent rights in the conduct of such war, as well as the regular government which is sought to be overthrown. All the writers on international law so lay down the rule.

But the question is, to what extent and for what purpose are such rights in such cases conceded to the insurgents?

That such rights are not conceded to rebels in civil wars

to the full extent and in the sense claimed in the argument here, is conclusively shown by the very authorities on which the counsel rely. For while they affirm that such rights must be conceded, they as distinctly assert the right, and even duty of the lawful government to hold the insurgents responsible for their acts, and to punish them severely for the same after they are overthrown and reduced to subjection. It is clear from this, that the belligerent rights allowed to the insurgents in such wars, are only so in an inferior and restricted sense, and for a particular purpose only, and do not in the slightest degree change or affect their legal status and relations to the regular government, and the loyal citizens thereof.

But the converse of this proposition was earnestly insisted on here, in which, in my judgment, consists the plain and fatal error, on which is based the whole argument for the defense.

The argument has uniformly proceeded upon the idea that the concession of such rights to the rebels in the late rebellion, thereby converted the war into a kind of *quasi* national war, and elevated the rebels and the so-called confederate states to a kind of equality with the national government and the loyal citizens, in so far as to entirely exonerate the rebel from personal responsibility for his otherwise illegal acts done in the prosecution of the rebellion.

But in my view, no more untenable and preposterous proposition could be advanced. It is not, in my view, sustained by law, reason nor justice, and is countenanced by no authority that I have been able to discover.

What, then, is the object of the concession of these rights in cases of civil wars and rebellion? Clearly not to validate the otherwise illegal acts and proceedings of the insurgents, as claimed here, or to change their true relations to the lawful government, and to shield them from punishment after they are overthrown and reduced to submission. But they spring directly from and are founded in the principles of humanity, and it is very clear they are accorded

for no other purpose than to mitigate the calamities of war, and thus prevent what must otherwise result, the war from degenerating into a frightful and inhuman contest of annihilation. These views are fully sustained by the authorities, and it is believed that no reliable authority can be found giving any color or countenance to the opposite doctrine maintained here by the defense. Vattel's Law of Nations, book 3, c. 18, s. 294, p. 488–9; Halleck's Int. Law, sec. 9, p. 323; Id., p. 344; *Rose* vs. *Himely*, 4 Cranch, 272; *Youst* vs. *Stout*, 4 Caldwell, 205; *Wright and Cantrell* vs *Overall*, 2 Caldwell, 337; *Wood* vs. *Stone*, Id., 369; *United States* vs. *Smith; Mauran* vs. *Insurance Company*, 6 Wallace, p. 1.

I do not forget that it was maintained by the counsel for the plaintiff in error, that the supreme court of the United States, in the *Prize cases*, 2 Black, 635, favored, if it did not expressly affirm, the doctrine of the defense here, and it has also been suggested that the same principle is recognized by that court in the late cases of *Mauran* vs. *Insurance Company*, 6 Wallace, p. 1, and *Hanger* vs. *Abbot*, Id. 532.

But after a careful reading of those cases, I do not think the court intended to commit itself to any such doctrine. On the contrary, the obvious distinctions between public wars and civil wars and rebellion are carefully kept in view, and impliedly, at least, the principles of those cases, as it appears to me, affirm the doctrines which I have endeavored to vindicate in this opinion.

The main question of law that was discussed and considered in the *Prize cases*, was a question of jurisdiction. Certain vessels of the claimants, with their cargoes, had been seized as prizes by officers of the public vessels of the government, for alleged violations of the President's proclamations (in the nature of proclamation of blockade) of the 19th, 27th and 30th of April, 1861. And on the part of the claimants, sustained by a minority of the court, the prize jurisdiction of the court was denied, upon the ground that at the time of issuing of said proclamations, no such

state of war existed, nor could exist, in the absence of any act of Congress declaring or recognizing its existence as would authorize the issuing of the proclamations or the assumption by the President of belligerent rights, and the treating of the rebels as enemies, in the sense of international law; and that the term enemy is only applicable to citizens and subjects of a foreign state or power at war with our own.

But this objection was overruled by the court, and it was held that the President of the United States, in fulfilling his duties as commander-in-chief, in suppressing an insurrection, had a right, under the state of things existing in the country at the date of the proclamations, and in the absence of any legislative sanction, to assume that such a state of rebellion and war actually existed in the country as would authorize him, for the purpose of suppressing it, to exercise the belligerent rights of a sovereign on the principles of the international law; and, consequently, to treat those engaged in the rebellion to subvert the government, as enemies, although they did not thereby cease to be traitors; (and it may be added that if they remained traitors, they must necessarily continue to be amenable to the municipal law,) and that the President's proclamations were conclusive on the court of the question, sanctioned, as they afterwards were, by the legislative department of the government; and that the government also had the unquestionable right in its suppression to exert its sovereign rights, as well as belligerent rights; and accordingly we find that throughout the entire rebellion the President proposed to suppress the rebellion by the aid, not only of belligerent rights, as accorded by international law, but also by virtue of the sovereign power of the government.

In the case of *Mauran* vs. *Insurance Company*, the only question was, whether the seizure, in May, 1861, of an insured vessel belonging to Mauran, by the officers and crew of a steamer belonging to the so-called confederate states, inside of the bar at the mouth of the Mississippi, was a

"capture" within the warranty of the insured found in the margin of his policy. The policy of insurance was in the usual form, insuring the vessel for one year against the perils of the sea, fire, enemies, &c. But it was written in the margin of the policy: "Warranted by the insured free from loss or expenses arising from capture, seizure or detention," &c.

On behalf of the insured, it was maintained that, inasmuch as the so-called confederate states had never been recognized by the government as a *de facto* government, and all the operations of the rebels in arms against the government unlawful and void, they must in this instance, stand on the footing and be treated as ordinary "pirates and sailing thieves," and that the taking by such never operated in law to make a capture, being only the acts of individuals, not done under color of authority from a rightful or *de facto* government or power; and that in this instance the officers and crew of the rebel vessel making the seizure of the steamer in controversy, could only be proceeded against as "pirates and sailing thieves," according to the established principles of the law of nations, and Crimes Act of 1790.

On the part of the insurers, the opposite doctrine was maintained. And it was argued that the question of the lawfulness or unlawfulness of the seizure, could never be raised in a controversy between the insurer and the insured. That the liability of the former did not depend on the legality of the taking, but that they were liable, however irregular and unlawful the capture might be; and that the taking by pirates and persons without any color of authority or law, constituted a capture, and consequently the taking in this instance was a capture, within the warranty in the margin of the policy.

The court sustained the latter view, and held that the defendants were not liable. And Justice Nelson, in delivering the opinion of the court, after showing that to constitute a capture within the warranty of the insured in this case, it

was not necessary or material that the taking should have been lawful, or done under a commission or authority from a regular or lawfully organized government or power, and that a *de facto* government, in possession of supreme power to the extent of its jurisdiction, might exist, although without right, and although it be "a government by usurpation, founded, perhaps, in crime, and in the violation of international or municipal law, and of right and justice," says, "we agree that all the proceedings of these eleven States, either severally or in conjunction, by means of which the existing governments were overthrown, and new governments erected in their stead, were wholly illegal and void; and that they remained after the attempted separation and change of government, in judgment of law, as completely under all their constitutional obligations as before." And again : "The Constitution of the United States, which is the fundamental law of each and all of them, not only afforded no countenance or authority for these proceedings, but they were, in every part of them, in express disregard and violation of it."

Now, with my poor powers of comprehension, I must concede my inability to discern any sound principle of law or reason upon which it can be maintained, that a party on whom all the constitutional obligations rest, engaged in the commission of an act that is wholly illegal and void, can yet be excused and justified as to injuries received and damages sustained by innocent parties in consequence of the doing of such unlawful act.

I can see no ground on which to found a doubt. It would, it seems to me, be a legal solecism, and the statement of the proposition, in my view, ought to be sufficient for its refutation, and to silence the controversy on the question involved in it.

In the case of *Hanger* vs. *Abbot*, an action of assumpsit was brought by the latter, a resident of New Hampshire, against the former, a resident of Arkansas, for a debt created previous to the late rebellion. And the statute of limi-

tations being pleaded that the right of action accrued to the plaintiff more than three years next before the commencement of the suit; and a replication to the plea, that by reason of the rebellion all the lawful courts of Arkansas where the defendant resided, were closed from the 6th of May, 1861, until the first of January, 1865, and that consequently the period during which the courts were so closed, should not be deemed and taken as any part of the three years limitation, as pleaded, the question was, whether the statute of limitations run during the period the courts in Arkansas were closed by reason of the rebellion.

It was decided that the statute did not run during this period, and the replication was held a sufficient answer to the plea.

Clifford, J., delivered the opinion of the court, and in the conclusion of his able and lucid opinion, after reviewing the authorities and showing the reasonableness of the doctrine which uniformly excludes from the computation of the periods of limitation the times during which the legal courts of a country in which the suit could be brought, are closed by war and violence, and by way of illustrating its absurdity, if the rule were otherwise, and the closing of the courts by the late rebellion was not sufficient to arrest the bar of the statute during the period they were so closed, says: "Unless the rule be so, (*i. e.* that the statute ceased to run,) then the citizens of a State may pay their debts by entering into an insurrection or rebellion against the government of the Union, if they are able to close the courts, and to successfully resist the laws until the bar of the statute becomes complete, which cannot for a moment be admitted."

Now, it seems to me, the principle announced here is directly parallel to the one that I have endeavored to sustain in the case now under review, and that it may, with even greater propriety and force, be said in our case, that unless the rule be as we have maintained it, then vicious citizens, desiring to enter into an insurrection or rebellion against the government, or to engage in a crusade of mur-

der, robbery and spoliation against other citizens, would only have to secure confederates enough to be able to successfully resist and defy the civil authorities, compel the government to resort to its military arm and engage in a war or *quasi* war to suppress them, and when defeated and reduced to submission, claim immunity for their illegal and nefarious acts, by shielding themselves under the plea of belligerent rights, and thus, with complete impunity, their diabolical purposes are accomplished!

It appears to me, therefore, that a principle so obviously absurd, and so fraught with mischief and peril, ought not to find favor or countenance in a court of justice, and be announced to the world as the law of the land. It has no reason or justice to support it. It is plainly inconsistent with the established maxim of law, that no right (to the wrong doer) can be founded on an illegal act, and is at war with the first principles of government, and the reciprocal rights and duties of protection and allegiance always subsisting between the government and its subjects. It moreover concedes in the government the elements of self-destruction instead of the rightful powers of self defense and preservation which necessarily inhere in all regular governments.

Better then, and more salutary, as it seems to me, would it be, to repudiate such a pernicious principle, and to affirm and proclaim the opposite and more just and rational doctrine, that a person who voluntarily violates the laws of his country must be responsible for his acts, and amenable to the laws so violated, so that if in the future evil disposed persons should again be tempted to engage in a criminal effort to subvert and destroy the government of this Union, they would be confronted with the terrors and penalties of the law, and know that they must enter on the unholy work in full view of all the hazard and grave consequences that might attach to such treasonable enterprize.

In my judgment, the demurrer to the plea just considered, was properly sustained.

Since preparing the foregoing views, I have seen in the New York papers a report of the decision of the case of *Hickman* vs. *Betts and others*, in the supreme court of the United States, in which it appears that the same defense was sought to be made that is made by the plea in this case already considered. But the defense was overruled, and the doctrine maintained in this opinion, respecting the question of belligerent rights, as I understand the decision, fully affirmed by that emminent court.

The next question in the order of their importance, (being the first error assigned,) which I propose to consider, is the demurrer to the replication to the defendant's second plea. It is a plea of the statute of limitations, and avers that the action was not brought within one year next after the right to bring the same accrued.

The replication to this plea is, that the plaintiff ought not to be barred from maintaining his action, because the said action is not barred in manner and form as alleged in the plea.

The office of a replication to a plea certainly is to either traverse it or confess and avoid it; and as the replication in this instance does neither, it is clearly insufficient and liable to demurrer.

But a bad replication to a plea involves the fate of the plea also, and we are required, therefore, to consider the question of the sufficiency of this plea, as if it had been demurred to.

In the argument here, this plea was sought to be sustained upon the ground that the act of the 27th of February, 1866, was invalid, because it impaired the obligation of contracts, and was, therefore, within the restrictions of the State and National constitutions. This presents a very grave question, and although urged here for the first time, we deem it proper to consider it, inasmuch as the plea, in my judgment, is clearly insufficient, if the law be sustained; but if the law be held invalid the plea is, in form and substance sufficient.

The authorities bearing on the question under consideration are very numerous, but I do not propose to review them to any extent in this opinion. In a number of cases the courts have held that an act of the legislature which revives a debt or claim which was previously barred by the statute of limitations, was invalid and void. On the other hand, numerous cases are found which go to sustain such an act as a valid law.

After careful examination and consideration, I am not prepared to declare the act we are considering unconstitutional and void. But, in my judgment, the doctrine established in the latter class of cases is much more reasonable and just than the opposite doctrine held in the former. And the validity of the law, it seems to me, can well be sustained both upon principle and authority.

In my view there is a clear and solid distinction between the vested rights which pertain to a person as a citizen, and the mere privileges which may be conferred upon him by law. And while in the former case the legislature has no power to divest him of such right, it is, in my opinion, clearly within the constitutional limits to take away any privileges that it may have previously granted.

In this case the law is in aid of a party who has lost a former right to sue by the lapse of time, and confers upon him a remedy to enforce a right which, however, was unavailing without the new remedy. While on the other hand it takes away from the other party a privilege which he previously enjoyed, only because it had been conferred on him by the same power which has taken it away.

This principle is fully recognized and affirmed, as I think, in the case of *The People* vs. *Livingston*, 6 Wend., 526, and the late and stronger case of *Exparte McCardle*, 7 Wallace, 506.

In the former case, Chief Justice Savage, in delivering the opinion of the court, after discussing the effect of the repealing act of 1828, on proceedings then pending, and rights previously existing, says : " It will not be denied, I

presume, that it is competent for the legislature to repeal any act upon which a suit has been brought, and if the repeal is absolute, such suit is at an end."

In the latter case, McCardle was before the supreme court of the United States, by appeal on a writ of *habeas corpus.* The jurisdiction of the court, in such cases, was conferred by the act of Congress of the 5th of February, 1867, so that when the appeal was taken, the court then having jurisdiction, McCardle had the undoubted right, under that law, to prosecute his appeal in that court. But while the appeal was pending, and after the same had been elaborately argued, the act of the 28th of March, 1868, was passed, repealing the act of the 5th of February, 1867. It was held that the repeal of the act last cited, upon which the proceedings were founded, was an end of the case, and the appeal was accordingly dismissed for want of jurisdiction in the court to proceed with it. And the doctrine is distinctly recognized and affirmed, that no judgment could be rendered in a suit after the repeal of the act under which it was brought and prosecuted, though it might be pending at the time the repealing law was enacted.

The rule laid down in these cases, it seems to me, is well founded, and is decisive of the question of the validity of the act now in question, as the act is in effect no more than a repeal of a previous law upon which alone the defendant's privilege or right to plead the statute of limitations was founded.

The act, too, it must be remembered, was passed under an extraordinary state of facts and circumstances during the late rebellion. And to hold that the legislature had no power to say that, in times of war, violence and confusion throughout the State, the statute of limitations should not run, or that a certain period of such time should not be counted in computing the statute of limitations, especially where the lawful courts in which the plaintiff might sue were closed during such period, as was the case here, would be to concede a feebleness and incompetency in the sovereign

power of the State to defend and protect her citizens, that I am wholly unprepared to admit. *Hanger* vs. *Abbot*, 6 Wallace, 532.

The case of *Wyatt* vs. *Morris*, 2 W. Va. Rep., 575, affirms a parallel principle to the one involved in the present case, and I think the authorities cited by the counsel for the plaintiff in error in that case, fully sustain the foregoing views and the validity of the act under consideration.

The act we have just considered, therefore, being a valid law, it of necessity follows that the plea under consideration is insufficient, and presented no bar to the plaintiff's action. And the replication to it being, as we have seen, also bad, the demurrer to it should have been sustained and the plea held for naught. *Hoke, ex'r*, vs. *Hokes*, 3 W. Va. Rep., 561.

But as the issue on the replication was an immaterial one, the error in overruling the demurrer to the replication could not be to the prejudice of the plaintiff in error, and, consequently, he cannot be heard here to complain. *Urton* vs. *Hunter & Harris*, 2 W. Va. Rep., 83.

Another error assigned, is the overruling of the defendant's motion for a change of the venue.

The evidence on this point is contradictory, and I am not able to see that the court committed an error in refusing the motion, especially as the verdict of the jury would not seem to indicate the existence of that unusual degree of prejudice claimed to have prevailed in the county against the plaintiff in error. And as this question is more elaborately considered in the case of *Caperton* vs. *Bowyer*, decided at the present term, I do not deem it necessary to notice it further.

Another error, it is suggested, consisted in sustaining the demurrers to the defendant's fourth and sixth special pleas.

Both of these pleas, I think, are clearly bad, and consequently, the demurrers to them were properly sustained.

It is also claimed that the court erred in not excluding the evidence offered by the plaintiff, mentioned in defendant's second bill of exceptions.

This evidence related to the subsequent imprisonment of the plaintiff at Richmond and Salisbury, and tended to show a continuation of the trespass and illegal imprisonment of the plaintiff, originally committed by the defendant, and the consequential injury and damages resulting from such illegal arrest and imprisonment, and was, therefore, in my judgment, clearly proper and pertinent evidence.

I think the court committed no error in excluding from the jury the pardon granted to the defendant by the President of the United States, as I am aware of no principle of law that would make it proper or competent evidence.

The remaining error assigned and insisted on, is the ruling of the court in refusing the instructions asked by the defendant, mentioned in his fourth bill of exceptions, and in giving those which were given in lieu thereof.

These instructions are quite numerous, and some of them not entirely free from ambiguity. But after minute examination, and the best consideration I have been able to bestow upon them, I have failed to discover any such substantial objection to any of them, whether given or refused, as would, in my apprehension, justify a reversal of the judgment.

Upon the whole case, therefore, I am brought to the conclusion to affirm the judgment, with costs and damages.

Maxwell, J., concurred in the affirmation of the judgment.

JUDGMENT AFFIRMED.